**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

TOVEKA BASKERVILLE, et al.,           )
                                              )    No.  15 C 3143
                     Plaintiffs,       )
                                              )    Judge Virginia M. Kendall
SGT. PEREZ, et al.,             v.       )
                                              )
                                              )
                    Defendants.      )
                                              )

## <u>MEMORANDUM OPINION AND ORDER</u>

On April 11, 2013, based on a lead from a confidential informant, Defendant Officers executed a search warrant at an apartment located at 1419 N. Washtenaw, Chicago, Illinois. They were looking for a heroin dealer named Too Short.  While executing the warrant, Defendants shot and killed Plaintiffs' family pet, Blue, a pit bull.  Defendants also recovered a bag of powder that eventually tested negative for narcotics which Plaintiffs contend, was simply cake mix that Toveka Baskerville used to make crunch cake.  Defendants recovered a gun during the search.  Baskerville was arrested and charged with unlawful use of a weapon by a felon and possession of a controlled substance.  Finally, Defendants recovered $12,000.00 in cash from the apartment.  After a bench trial, he was found not guilty.  Plaintiffs allege that Defendants violated their constitutional rights and bring claims of false arrest, illegal seizures,  state law claims for malicious prosecution and intentional infliction of emotional distress and for indemnification.   Numerous material facts are at issue regarding what actually happened that night and therefore Defendants' Motion for Summary Judgment is denied on all counts except for Count IV, the claim for illegal seizure of money, which is granted because Plaintiff Galarza

had an adequate post-deprivation remedy and she failed to develop an argument responsive to Defendants' Motion.

## I.    Background

On April 10, 2013, Officer Jolliff-Blake met with a confidential informant ("Doe"[1]). (Def. SOF ¶ 4.)  Doe told Officer Jolliff-Blake that he had bought heroin the day before from a drug dealer who went by "To Short," [sic] at an apartment located at 1419 N. Washtenaw, Chicago, Illinois on the day before meeting Officer Jolliff-Blake.  Doe claimed to have purchased heroin approximately ten other times in the last six months from Too Short.  (Def. SOF ¶4.)  Doe described Too Short as "a male, black, 5'07'', 180 lbs. 38-40 years old, shortcut, black hair, brown eyes, dark complexion."  (Search Warrant, Dkt. 63-6.)    Doe did not know Too Short's legal name.  That same day, Officer Jolliff-Blake searched the Cook County Assessor's database for the 1419 N. Washtenaw location, pulled a photograph of the property from the site, and showed it to Doe who confirmed that the photo showed the apartment building where he had bought the heroin from Too Short..  (Complaint for Search Warrant, Dkt. 63-4.) Next, Doe accompanied Officer Jolliff-Blake as he drove by the apartment and he again confirmed that it was the location where he bought heroin from Too Short.  (Def. SOF ¶ 7.) During his deposition, Officer Jolliff-Blake stated that he knew that Too Short was a gang member with a criminal history.   (Def. SOF ¶ 9.)  Officer Jolliff-Blake testified that he learned this information for the first time when Plaintiff Baskerville told him during the execution of the search warrant, but also stated that he had "some knowledge" of it before that; he never stated where he learned this information nor whether he obtained it from Doe.  (Jolliff-Blake Dep.

---

[1] Doe refers to John Doe, an alias used to protect the confidential informant because Officer Jolliff-Blake did not reveal his source.

102:1-12)[2].  Additionally, while it is typically Officer Jolliff-Blake's practice to do a computer search using a Chicago Police database to look for arrests that have occurred at the location that is the target of a search warrant, Officer Jolliff-Blake did not conduct such a search in this case. (Def. Resp. Pl. SOAF ¶ 8.)

Officer Jolliff-Blake prepared a Complaint for Search Warrant and a Search Warrant permitting a search of the apartment and the seizure of any heroin, paraphernalia used in the weighing, cutting or mixing of illegal drugs, any documents showing proof of residency, and any proceeds from the sales of contraband narcotics, and any records detailing illegal drug transactions.  (Def. SOF ¶¶ 10, 14.)    In the affidavit, Officer Jolliff-Blake incorporated the information he obtained from Doe.  He did not include any background regarding Doe's reliability, such as whether he had ever relied on Doe before.[3]  Officer Jolliff-Blake presented the warrant to an Assistant Cook County State's Attorney, who, in turn approved and signed the documents.  (Def. SOF ¶ 11.)  Then at approximately 11:09 p.m. on April 10, 2013, Jolliff-Blake appeared with Doe in person before a Cook County Circuit Judge and presented the Complaint for Search Warrant and Search Warrant to the judge who had the opportunity to meet Doe, and who signed off on the warrant determining that there was probable cause to believe that evidence of drug dealing would be found at the address.  (Def. SOF ¶ 12.)

---

[2] Officer Jolliff-Blake was next asked, "What knowledge did you have [of To Short's gang activity]?  A: It was clear to me that the person that was targeted was a gang member and that typically gang members have criminal histories. And there was nothing that I learned that told me otherwise, so to speak."  (*Id.* 102:13-19.)  When Jolliff-Blake was asked why this was "clear" to him," Defense counsel advised him not to answer any further questions on the subject based on the informant privilege.  Based on these objections, Jolliff-Blake never disclosed whether he learned this information from Doe.

[3] During depositions, Defendants' attorney instructed her clients not to answer any questions relating to Doe, including whether Doe had ever previously been relied on as an informant, so as to protect his identity.  (Jolliff-Blake Deposition, Dkt. 63-3, 10:1-9.)  These objections were in error because not all of the questions asked would have revealed the informant's identity especially whether the informant had been successful in the past with providing information that led to arrests and convictions.

Later in the evening of April 10, Officer Jolliff-Blake held a meeting with the other Defendant Officers to brief them on their objective and to make plans for the execution of the search warrant. (Def. SOF ¶ 15.) At the debriefing meeting, the Defendants received information that there could be an aggressive dog inside the basement apartment and that there might also be children present. (Def. SOF ¶ 16.)

A few hours after the warrant was approved, at approximately 1:14 a.m. on April 11, Sgt. Perez and Officers Jolliff-Blake, Rivera, Ortiz, and Fraction along with at least five other Chicago Police Officers, wearing masks, arrived at 1419 North Washtenaw Avenue to execute the search warrant. (Def. SOF ¶ 19.)

At the time of the search, Lisa Galarza and her two minor children, MB and MG, lived in the 1419 North Washtenaw apartment with their pet dog, Blue. Blue, a pit bull, had been Plaintiff Galarza and MB's pet for 11 years and Plaintiff MG's pet his entire life. (Pl. SOAF ¶ 1.) Blue had never bit anyone nor shown any other signs of aggression. (Pl. SOAF ¶ 31.) MG and MB's father, Toveka Baskerville, were also staying in the apartment on the night of the search. (Def. Resp. Pl. SOAF ¶ 11.)

The parties agree that the next several moments after the officers entered the pitch-black basement apartment were chaotic. (Def. Resp. Pl.'s SOF ¶ 73.) Beyond that, the parties dispute how these moments unfolded. According to the Defendants, Officer Rivera was the first officer to enter the unlocked basement apartment door. (Def. SOF ¶ 21; Deposition of Officer Brian Ortiz, Dkt. 63-8, 24:15–16.). Officer Ortiz, who was behind Officer Rivera, had his gun in one hand and a flashlight in the other. (Def. SOF ¶ 22.) Sgt. Perez was the third Defendant to enter the basement apartment. (Def. SOF ¶ 23.) Officer Rivera and Sgt. Perez heard a dog growling from inside one of the bedrooms of the apartment. (Def. SOF ¶ 25.) As Officer Rivera moved to

the middle of the living room, he and Sgt. Perez observed a dog open the door to the bedroom with his snout and continue to bark as he exited the bedroom. (Def. SOF ¶ 26.) Officer Rivera and Sgt. Perez recognized that the dog was a pit bull from its large block-like head and closely cropped ears. (Def. SOF ¶ 29.) The dog was about four to six feet away from the three officers when Officer Rivera and Sgt. Perez tried to distract the dog with their flashlights. (Def. SOF ¶ 30.) The dog stopped momentarily, and then bared its teeth, growled, and assumed a charging position by dropping the front part of his body lower than the back of his body. (Def. SOF ¶ 31.) Believing that the dog was a threat, Officer Rivera aimed and discharged his weapon at the dog as the dog lunged toward him. (Def. SOF ¶¶ 32, 34.) The dog stumbled, but then it proceeded to regain its footing and began to charge towards the officers again. (Def. SOF ¶ 35.) Officers Rivera and Ortiz, almost simultaneously, discharged their weapons at the dog, this time killing Blue. (Def. SOF ¶ 37.)

Plaintiffs tell a different version of those moments. On the evening of the search, Baskerville, Galarza, and Blue slept in a bedroom toward the back of the home and her children were in the bedroom closest to the front door of the apartment. (Pl. SOAF ¶ 17.) Galarza woke to a loud banging in the living room. (Pl. SOAF ¶ 18.) She followed Blue into the living room just prior to the officers' entrance. (Pl. SOAF ¶¶ 19, 21.) According to Galarza and contrary to Defendants' version, Blue did not bark; in fact, Blue typically did not bark at all when someone was at the door. (Deposition of Lisa Galarza "Galarza Dep.", Dkt. 63-1, 61:17–19). Also inconsistent with Defendants' version, Galarza insists that the door to her home was locked that evening. (Pl. SOAF ¶ 20; *Id.* 47:9–12). As soon as they entered, Galarza remembers Defendants began shooting at Blue. (Pl. SOAF ¶ 26.) Blue did not charge at the officers but instead ran to

Galarza's side after the initial gun shots. (Pl. SOAF ¶ 27.) Defendants then shot at Blue again. (Pl. SOAF ¶ 30.) Blue fell to the floor of the living room and died. (Pl. SOAF ¶ 25.)

At some point after the shots were fired, Defendants assert that they saw Baskerville peak his head out of the bedroom and the officers ordered him to come out to the living room. (Def. SOF ¶ 45.) Baskerville, however, testified that he was awakened by screaming and gun shots and when he awoke, he saw someone in his bedroom with a mask. (Deposition of Toveka Baskerville, "Baskerville Dep.", Dkt. 63-13, 171:5–172:3.) Officer Jolliff-Blake believed that Baskerville was Too Short because his "appearance matched the physical description" provided by Doe. (Def. SOF ¶ 48.) But Plaintiffs point out that Baskerville is 5'2 and 150 pounds (Pl. SOAF ¶ 7); Doe told Jolliff-Baskerville that Too Short was 5'7 and 180 pounds. (*See* Search Warrant, Dkt. 63-6.) Baskerville also claims that he never told nor admitted to the officers he had previously been arrested, that he never said that he lived in the apartment, and that he did not confirm that he went by the nickname "Too Short." (Affidavit of Toveka Baskerville, Dkt. 72-11, ¶¶ 4, 6, 9.) Officer Jolliff-Blake claims that Baskerville confirmed his criminal history and that his nickname was Too Short during the arrest. (Def. SOF ¶ 50.)

After Blue was shot, the children woke up and entered the living room. (Def. SOF ¶ 51.) Defendants moved the children, Galarza, and Baskerville to the couch in the living room a few feet from Blue who was lying in a pool of blood. Officer Ortiz eventually put a sheet over Blue. (Pl. SOAF ¶ 34; Def. SOF ¶ 53.) MG, Galarza's son who was 6 years old at the time of the search, drew a picture during his deposition of that night and included "guy with a gun pointing at us," and also drew officers "kick[ing] Blue." (Deposition of MG, Dkt. 63-10, 10:5–6, 10:3–4.). MB, Galarza's daughter, was 10 years old at the time. (Deposition of MB, Dkt. 63-11, 13:13–15). She recalled that her brother kept looking down at his hands and he was like

shaking." (*Id*. 44:16-17.) MB also remembers screaming to the Officers, "why did you do that to my dog[?]" (*Id.* at 41:5–6.) And the officers responded to her cries, "shut the f up" (*Id.* at 42:9–13.) Defendants, on the other hand, assert that Officer Fraction merely spoke with MB and MG about school during the search of the apartment and dispute that she used profanity toward the children. (Def. SOF ¶ 52.)

*The Bag of Powder*

Sgt. Perez took photographs inside the apartment before the actual search began because it is common practice to show what the search area looks like before any evidence is moved. (Pl. SOAF ¶ 36; Deposition of Sgt. Nelson Perez, "Perez Dep.", Dkt. 63-9, 76:9–13; 84:18–22.) Officer Jolliff-Blake started his search in the kitchen area and then moved to Galarza's bedroom. (Pl. SOAF ¶ 37.) Officer Jolliff-Blake found and recovered a clear plastic bag containing white powder, which he suspected was heroin, and a folded bundle of money, on top of the dresser in Galarza's bedroom. (Def. SOF ¶ 60.) Other officers, including Sgt. Perez, searched the bedroom before Officer Jolliff-Blake and no one saw this bag. (Pl. SOAF ¶¶ 36, 39.) The bag of white powder is also not reflected on the sketch of the premises nor in any of the photographs of the apartment. (Pl. SOAF ¶¶ 57, 58, 61.) Officer Jolliff-Blake testified that he secured the bag and that although he would usually wait for a photograph to be taken of evidence recovered, he did not wait due to the "chaotic nature of the apartment." (Deposition of Officer Michael Jolliff-Blake Dep., "Jolliff-Blake Dep.", Dkt. 63-3, 83:24–84:8.)

In contrast, Plaintiffs assert that Officer Jolliff-Blake took a bag of cake flour from the kitchen, brought it to the bedroom, and then lied about where he had found it. (Pl. SOAF ¶ 70.) MB testified that she saw a male officer first exit the kitchen, not the bedroom, with the bag of white powdery substance. (MB Dep., 63-11, 53:15–54:24.) During Galarza's deposition, when

she was asked where the bag of white powder came from, she testified that the only thing she could think of was that the bags came from boxes of cake mix she kept in the kitchen cabinets; when Baskerville made his famous "crunch cake," he would use half the box and store the other half in a baggie.[4] (Galarza Dep. 150:11–152:5.) Galarza further testified that after the night the search took place, the cake mix boxes were scattered throughout the kitchen. (*Id.* 152:18–151:6.)

On or around April 15, 2013, the suspect narcotics in the clear plastic bag, which had been submitted for testing to the Illinois State Police, came back negative for the presence of a controlled substance. (Def. SOF ¶ 71.) The possession of narcotics charge was eventually dropped. (*Id.*) It is undisputed that, ultimately, no illegal drugs or drug paraphernalia were found in the apartment. (Pl. SOAF ¶ 78.)

*The Gun*

When Officer Jolliff-Blake searched Galarza's bedroom, he found a semi-automatic loaded handgun in the closet. (Pl. SOAF ¶¶ 50, 51.) The parties dispute where in the closet the handgun was located. Galarza testified that the gun was in one of her purses on a shelf in the closet and Defendants deny that the gun was in a purse. (Pl. SOAF ¶ 50; Def. Resp. Pl. SOAF ¶ 50). Before retrieving the gun, Officer Jolliff-Blake asked Sgt. Perez to take a photograph of the gun. (Pl. SOAF ¶ 52.) Next, Officer Jolliff-Blake went into the living room and informed Baskerville that he was under arrest for possession of the gun that he had found in the bedroom and read him his Miranda rights. (Def. SOF ¶ 57.) Defendants contend that Baskerville admitted that the gun belonged to him and that he had bought it on the street for $200. (Def.

---

[4] During his deposition, Baskerville was asked whether he did any baking in the Washtenaw apartment, he did, Defendants' counsel then asked: "Q: What's the special cake that you make? A: A crunch cake. Q: Do you make it from scratch? A: Yes I do. Q: What's in it? A: I can't tell you. Q: A secret recipe? A: yes. Q: Unfortunately, it's a deposition. There's no secrets you're going to have to tell me your recipe." (Baskerville Dep. 226:16–227:4). The Court will protect Baskerville's recipe but notes that the ingredients include cake mix from a box, consistent with Galarza's testimony.

SOF ¶ 58.)  But according to Plaintiffs, Baskerville did not readily admit to owning the gun. Instead, they maintain that the gun belonged to Galarza.  Galarza told this to the Defendants and that the Defendants proceeded to threaten her that DCFS would take away her children if the gun was hers, so Baskerville said that the gun was his.[5]  (*See, e.g.,* Baskerville Dep. 199:22–200:3) ("They said call DCFS.  We're going to take the kids away, because they found the gun and said – I don't know.  And my kids started to cry, and I just told them it was mine."); *See also*, MB Dep. at 39:13–18 (MB remembers hearing the officers threatening her mom that if she didn't give up her gun and tell the officers where the money was that they would take the kids away.)

*The Money*

In addition to the bag of powder and the gun, Officer Rivera observed a plastic bag in a bin and upon further examination, discovered $12,000 in cash bundled together by rubber bands, which was seized by the officers.  (Def. SOF ¶ 63.)  The parties dispute what Baskerville stated with regard to the money; Defendants assert that he told the officers half of the money seized was his and Plaintiffs assert that he told an officer that only roughly $200 found in his bag on the floor was his.  (Pl. Resp. SOF ¶ 64.)  Based on their experience as law enforcement officers, Officers Rivera and Jolliff-Blake found the way in which the money was stored and bundled up in rubber bands was indicative of how drug dealers store and package their money.  (Def. SOF ¶ 65.)  Galarza and MB testified that they told the officers that the money found belonged to Galarza.  (Pl. SOAF ¶ 68.)  The $12,000.00 reflected money that Galarza had been saving from her mother and her dog walking business.  (Galarza Dep. 89:920; 90:11–20.)  She did not have a bank account at the time of the search. (*Id.* 91:24–92:2.)

---

[5] Plaintiffs further maintained that Baskerville actually hates guns; Galarza had bought the gun behind his back. (Galarza Dep., 85:12–17) (Q: Did you ever show the gun to Toveka? A: No. Q: Why not? A: Because he would be mad. Q: Why would he be mad?  Q: He doesn't like guns.).

Ultimately, Baskerville was arrested and charged with unlawful use of a weapon by a felon and possession of a controlled substance.[6] After his arrest, Plaintiffs reached out to their condominium's association and requested the DVDs from the surveillance cameras around the apartment complex; there was a camera in the front and back of the apartment complex. (Galarza Dep., 50:12–52:19.). Plaintiffs were able to review the footage from the night of the search but Baskerville's criminal defense attorney misplaced the DVDs. (Galarza Dep., 126:2–7.)

A grand jury indicted Baskerville for being an armed habitual criminal and for unlawful use of a weapon by a felon. (Def. SOF ¶ 72.) During his grand jury testimony, Officer Jolliff-Blake testified that the search also revealed proof that Baskerville lived at the 1419 N. Washtenaw apartment. (Pl. SOAF ¶ 84.) Defendants found prescription medication bottles in Galarza's room on top of the dresser listing Baskerville's address as being in Monroe, Michigan. (Pl. SOAF ¶ 62.) Additionally, the bridge card found inside the apartment with Plaintiff Baskerville's name on it says "Michigan EBT" on the front. (Pl. SOAF 64.) Baskerville testified that he moved to Michigan approximately five years[7] ago to "escape street life"[8] as well as to seek medical treatment for a health issue. (Baskerville Dep. 23:21–25:16). Travel is not easy for Baskerville due to his medical condition and in order to visit Chicago, Baskerville needed to seek permission from his doctor, as he had done for his visit during the time period of the search. (*Id.* 23:2–17.). Officer Jolliff-Blake was not asked and therefore did not specify

---

[6] It is undisputed that when he was asked for his address at the police station, Baskerville responded with 1419 North Washtenaw Avenue. (Def. SOF ¶ 67.) Defendants assert that this is another fact weighing in favor of their determination that Baskerville was living in the apartment.

[7] It is not clear in the deposition testimony whether "five years" is from the date of the deposition or from the time that the search was executed.

[8] Baskerville had been a member of the Latin Kings. When he quit the gang, the Latin Kings were unhappy that he had "just walked away from them," and so that was one of the reasons that he moved to Monroe, Michigan to live with his sister. (Baskerville Dep., 19:24–21:1).

what evidence he had that Baskerville lived at the Washtenaw address in his grand jury testimony.

On November 21, 2014, Baskerville proceeded to a bench trial on the charges of armed habitual criminal and unlawful use of a weapon by a felon.  (Def. SOF ¶ 73.)  The judge found Baskerville not guilty on both charges.  (Def. SOF ¶ 74.)

*Forfeiture*

On or around December 14, 2013, Galarza filed a verified claim contesting forfeiture of the money and requested that the money be returned to her.  On June 25, 2013, Galarza entered in a settlement agreement with a Cook County Assistant State's Attorney and voluntarily agreed to forfeit $7,692.00 of the seized money, which was to be delivered to the Illinois State Police for disposition pursuant to the Forfeiture Act.  (Def. SOF ¶ 78.)  Pursuant to the terms of the settlement agreement, the Cook County Assistant State's Attorney agreed to release $5,000.00 to Galarza, which Galarza received.  (Def. SOF ¶ 79.)  Galarza was not happy that only half of the money was returned but testified that she agreed to the amount because she needed the money.  (Galarza Dep., 96:3–7.)  She did not make further attempts to obtain the rest of the money because the State's Attorney told her she "would never get it."  (*Id.* 96:12–18.)

## II. Plaintiffs' Motion to Strike

In their Response to the Motion for Summary Judgment, Plaintiffs argue that the "Court should strike many of Defendants' Asserted Facts."  (Dkt. 70, p. 7–10.)  Additionally, Plaintiffs' move the Court to strike two of Defendants' responses to Plaintiffs' Rule 56.1 statement.  (Dkt. 84).  For the following reasons, the Motion to Strike Defendants' responses is granted and Plaintiffs' request to strike specific paragraphs of Defendants' Rule 56 statement is denied.

Plaintiffs argue that several of Defendants' Rule 56 facts violate the admonition requiring short statements and contain improper legal conclusions. (Dkt. 70, p. 7–10.) Plaintiffs ask the Court to strike paragraphs 35, 37, 45, 48, 50, 56, 59, 60 of Defendants' Rule 56 statement. The rule requires that a statement of facts: "shall consist of short numbered paragraphs, including within each paragraph specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph." LR 56.1. Rule 56 is intended to assist the district court by "organizing the evidence, identifying the undisputed facts, and demonstrating precisely how each side proposed to prove a disputed fact with admissible evidence." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000) (internal citation omitted). There is no definition of "short," in the rule and there is no binding case law that provides such a definition. Each of the cited paragraphs in Defendants' facts pertains to a single topic. For example, Plaintiffs ask the Court to strike Paragraph 37 which states: "Fearing for their safety and the safety of their fellow officers, Officers Rivera and Ortiz, almost simultaneously, discharged their duty weapons at the dog causing the dog to fall to the floor." (SOF ¶ 37.) The statement consists of one sentence and describes one moment in time. There is no reason Plaintiffs could not respond to such a paragraph, indeed they did. (*See* Dkt. 71.)

Plaintiff further contends that these paragraphs contain legal conclusions. Paragraph 59, Plaintiffs specifically argue, consists of legal conclusions, including that "Baskerville did not disclaim[] ownership of the gun …. [and there is no evidence he told an officer that he] had a lawful right to possess the gun." (PSOAF ¶ 59.) But Plaintiffs take the phrase "lawful right to possess" out of context and argue that it is a legal conclusion. In Paragraph 59, Defendants merely state that there is an absence of evidence that Baskerville disclaimed ownership of the

gun. Defendants do not set forth any sort of legal conclusions about gun ownership. The Court also notes that Plaintiffs themselves have failed to follow the spirit and the letter of Local Rule 56.1, with which the court has discretion to demand strict compliance. (*See* Dkt. 76, "Plaintiff's counsel inappropriately filed an oversized brief and a significantly oversized R. 56 statement in violation of the Court's rules."); *see also Raymond v. Ameritech Corp.*, 442 F.3d 600, 604 (7th Cir.2006); *FTC v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005) (collecting cases). For those reasons, the Court will not strike Defendants' paragraphs 35, 37, 45, 48, 50, 56, 59, and 60.

In the Motion to Strike, Plaintiffs ask the Court to strike Defendants' responses because Defendants incorrectly characterize Plaintiffs' facts as containing inadmissible hearsay. (Dkt. 84 at 2.) Specifically, two[9] of Plaintiffs' proffered facts contain hearsay, paragraphs 47, and 48, and should be disregarded. A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2011). "Hearsay" under Federal Rule of Evidence 801(c) "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." However, "[s]tatements that are offered not to prove 'the truth of the matter asserted,' but for some other legitimate purpose, do not qualify as hearsay." *United States v. White*, 639 F.3d 331, 337 (7th Cir. 2011) (quoting *United States v. Bursey*, 85 F.3d 293, 296 (7th Cir. 1996)). Paragraph 47 states that, "Plaintiff Baskerville said that [he would take the gun charge] after hearing an officer say that Lisa would be arrested for having the gun." Defendants then object to the next paragraph, "Plaintiff Baskerville said that [he would take the gun charge] after hearing

---

[9] Defendants also correctly point out that in Plaintiffs' paragraph 44 of their Rule 56 statement, Plaintiffs inadvertently left out a citation and the Court granted leave for Plaintiffs to file a supplement correcting the paragraph. (*See* Dkt. 87.) Initially, Defendants included a hearsay objection to paragraph 44. After Plaintiffs filed the supplement with the citation, Defendants no longer objected on the basis of hearsay. (Dkt. 88.)

an officer that the children would be taken away." (*Id.* ¶ 48.) Defendants object to these statements because they are allegedly made by an officer and therefore constitute inadmissible hearsay. The motion to strike the responses is granted for two reasons. First, these statements may be offered for a non-hearsay purpose. Rather than going to the truth of the matter asserted, the statements show Baskerville's motive for taking the gun charge when, Plaintiffs argue, the gun belonged to Galarza. Therefore, the statements in paragraphs 47 and 48 are admissible not for the truth of the officers' statements but for their effect on Baskerville, the listener. *See United States v. Shaw*, 824 F.3d 624, 630 (7th Cir. 2016). Second, the evidence falls under a hearsay exception to statements made by a party opponent because Defendants allegedly made the statements. *See* Fed Rules Evid. 801(d)(2). Defendants' Responses to Plaintiffs' paragraphs 47 and 48 are stricken.

## III. Legal Standard

Summary judgment is appropriate where the admissible evidence shows that no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A 'material fact' is one identified by the substantive law as affecting the outcome of the suit." *Bunn v. Khoury Enters., Inc.,* 753 F.3d 676, 681 (7th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "A 'genuine issue' exists with respect to any such material fact, and summary judgment is therefore inappropriate, when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 681–82 (citing *Anderson,* 477 U.S. at 248). On the other hand, "where the factual record taken as a whole could *not* lead a rational trier of fact to find for the nonmoving party, there is nothing for a jury to do." *Bunn,* 753 F.3d at 682 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (emphasis in original)). In determining whether a genuine issue

of material fact exists, the Court construes the evidence and all inferences that reasonably can be drawn in the light most favorable to the nonmoving party. *See id.* at 682 (citing *Anderson,* 477 U.S. at 255); *see also Kvapil v. Chippewa County, Wis.,* 752 F.3d 708, 712 (7th Cir. 2014).

## IV. Discussion

Defendants move for summary judgment on Plaintiff Baskerville's false arrest and failure to intervene claim against Defendants (Count I); the minor Plaintiffs and their mother, Lisa Galarza, illegal seizure claim for Blue, the dog, pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment against Defendant Officers Ortiz and Rivera (Count III); Plaintiff Galarza's illegal seizure of property claim pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment against all the Defendant Officers for the alleged unjustified seizure of her money (Count IV); Plaintiff Baskerville's claim for Malicious Prosecution against Officer Jolliff-Blake (Count V); the minor Plaintiffs' claim for Intentional Infliction of Emotional Distress under state law (Count II); and finally, Plaintiffs' claim for indemnification against the City of Chicago (Count VI).

### A. False Arrest

In order to prevail on a claim of false arrest, the plaintiffs must show that they were arrested without probable cause because probable cause is an absolute defense to such a claim. *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (citing *Williams v. Rodriguez*, 509 F.3d 392, 398 (7th Cir. 2007). A police officer has probable cause to arrest a person if, at the time of the arrest, the "facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). "Probable cause to arrest exists if the totality of the circumstances known to the officer at the time of the arrest would warrant a reasonable

person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013). And because "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion'" protection from warrantless searches stands "[a]t the very core of the Fourth Amendment," *Id.* (quoting *Kyllo v. U.S.*, 533 U.S. 27 (2001). The jury must determine the existence of probable cause "'if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them.'" *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1013–14 (7th Cir. 2006) (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir.1993)).

There are disputed issues of fact that call into question Defendants' probable cause to arrest Baskerville for unlawful possession of the gun and for possession of a controlled substance. Turning first to the arrest on the basis of UUW-by felon, there are two elements of the crime: (1) the knowing possession or use of a firearm and (2) a prior felony conviction. 720 ILES 5/24-1.1(a). As to the first element, it is disputed where the Defendants found the gun in the apartment; if it was in Galarza's purse, as she testified, then it was less reasonable for the Defendants to believe that Baskerville had knowingly possessed a firearm. And it would be even less reasonable if Defendants had threatened Galarza that DCFS would take away her children if the gun belonged to her and that Baskerville only claimed ownership of the gun in response to these threats. As to the second element, a prior felony conviction, Officer Jolliff-Blake and Baskerville again provide conflicting testimony. Officer Jolliff-Blake testified that he learned Baskerville had a criminal history because Baskerville told him at the time of the arrest; Baskerville asserts that he never told the officers that on the night of the search. (Jolliff-Blake Dep. 102:1-12; Baskerville Aff., Dkt. 72-11, ¶¶ 4, 6, 9.) Defendants also had evidence suggesting that Baskerville did not reside in the apartment. His medication bottles and bridge

card stated that he lived in Michigan and Baskerville further claims he only had a bag with his clothing in it on the ground. Officer Jolliff-Blake, on the other hand, saw men and women's clothing in the closet where the gun was found. (SOF ¶ 55.) Whether Defendants had probable cause to arrest Baskerville for unlawful possession of a gun, therefore, is disputed.

There is also a question as to whether the officers had probable cause to arrest Baskerville for the alleged possession of a controlled substance. Officer Jolliff-Blake alleges that he recovered a Ziploc of powder from the top of the dresser in Galarza's bedroom. As Defendants point out, the fact that the powder tested negative for narcotics, taken in isolation, is not dispositive of the probable cause issue because the Court looks at what the officers knew at the time of arrest. *Gutierrez*, 722 F.3d at 1008. But the evidence surrounding Officer Jolliff-Blake's recovery of the bag nevertheless creates a jury question. It is undisputed that Officer Jolliff-Blake recovered the bag after Sgt. Perez took photographs of Galarza's bedroom and yet there is no bag of powder in any of Sgt. Perez's photographs. (Pl. SOAF ¶¶ 57, 58, 61.) Multiple other officers had been in the bedroom before Officer Jolliff-Blake, but according to Defendants, somehow all of them missed the bag. MB also testified that she saw an officer bring the bag of powder not from the bedroom but from the kitchen. (MB Dep., 63-11, 53:15–54:24.) Galarza kept bags of cake mix in the kitchen cabinet; when the family would use only half of a box of cake mix, she would put the other half into a Ziploc baggy. After the search, Galarza testified these boxes of cake mix were scattered throughout the kitchen. (Galarza Dep., 152:18–151:6.) If Officer Jolliff-Blake had found these bags in cake mix boxes and lied about recovering the bag from the dresser, then a reasonable jury could find that the arrest on the basis of possession of a controlled substance lacked probable cause. And while the fact that the powder tested negative for narcotics does not negate probable cause, it bolsters Plaintiffs'

version of events and therefore is relevant to their credibility. Finally, the evidence that Baskerville might actually live in Michigan, the pill bottles and bridge card, calls into question Doe's story that he had bought heroin from the apartment ten times in the last six months and a jury might find Doe to be incredible and therefore the warrant lacking in probable cause.

Defendants insist that "the discovery of a white-powdered substance in a person's possession alone is generally sufficient to establish probable cause for the police to believe such substance is drugs." (Dkt. 62 at 7.) In support, Defendants rely on *Johnson*, in which a sergeant discovered contraband on Johnson's person during a search incident to arrest giving the officers probable cause for a warrantless search of Johnson's car. Specifically, while searching Johnson, a paper packet containing a white powder fell from his hat, but the powder eventually tested negative for narcotics. *U.S. v. Johnson*, 383 F.3d 538, 545-46 (7th Cir. 2004). The fact that the powder eventually tested negative for narcotics did not change the probable cause analysis in *Johnson*, nor does it here. Instead, the disputed facts relating to Officer Jolliff-Blake's recovery of the bag, such as the absence of the bag in the initial photographs of the apartment, potentially negates probable cause. There were no such disputed facts about whether the packet of powder fell from Johnson's hat to the ground. Similarly, Defendants rely on *Garcia v. City of Chicago*, in which an officer found a white bag of powder near Garcia's feet and arrested him. Garcia argued that the Fourth Amendment requires that police officers perform tests on substances believed to be illegal drugs immediately at the police station. 24 F. 3d 966, 968 (7th Cir. 1994). The Court held that there was no reason why a twenty-day period of time for testing a substance believed upon probable cause to be cocaine is constitutionally deficient. *Id.* But here, Plaintiffs do not assert that their constitutional rights were violated because the Defendants did not immediately test the substance. And again, that the bag recovered from Galarza's apartment

eventually tested negative for controlled substances is not the basis for calling probable cause into question. Finally, in both *Garcia* and *Johnson*, the courts also relied on the defendants' criminal histories in finding that the officers had cause to arrest Garcia and search Johnson. Garcia was on probation for two felonies for possession of a controlled substance and Johnson had an outstanding warrant for his arrest. Here, there are disputed facts about whether the Officers reasonably relied on information about Baskerville's criminal history.

### B. Failure to Intervene

Next, Defendants move for summary judgment on Baskerville's failure to intervene claim. An officer "who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). A "realistic opportunity to intervene" may exist whenever an officer could have "called for a backup, called for help, or at least cautioned" the violating officer to stop. *See Yang*, 37 F.3d at 285. The two prongs of this analysis almost always implicate questions of fact for the jury: "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Abdullahi*, 423 F.3d at 774 (quoting *Lanigan v. Vill. of East Hazel Crest*, Ill., 110 F.3d 467, 478 (7th Cir. 1997). A "realistic opportunity to intervene" may exist

whenever an officer could have "called for a backup, called for help, or at least cautioned" the violating officer to stop. *See Yang*, 37 F.3d at 285.

Defendants argue that they had a reasonable belief that Baskerville was a felon in possession of a firearm and therefore they had probable cause to make the arrest and there was no need for intervention. Because there are disputes as to where Defendants found the gun, whether they threatened Galarza before Baskerville stated it belonged to him, whether Baskerville ever admitted to being a felon or if Officer Jolliff-Blake had another reasonable basis for that belief, and whether Officer Jolliff-Blake was truthful about recovering the bag of powder, Defendants' probable cause analysis does not warrant summary judgment. There is also evidence that Defendants had opportunity to intervene. Defendants could have intervened by pointing out, for example, that the bag of powder was not initially found on the dresser even though multiple officers had searched the room or intervened during the alleged threats to Galarza to take away her children. For those reasons, the Motion is denied with respect to Plaintiff's failure to intervene claims.

### C. Unlawful Seizure of Pet

Defendants next move for summary judgment for a "panoply of reasons" on Plaintiffs' claims relating to the Defendants' unreasonable seizure of the family pet, Blue.[10] (Dkt. 62 at 9.) The Fourth Amendment, which is applicable to the states through the Fourteenth Amendment, states that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated." U.S. Const. Amend. IV. A

---

[10] Defendants first assert that constitutional violations arising from the shooting of a dog are cognizable solely as an unreasonable seizure under the Fourth Amendment and not under the Fourteenth Amendment, which Plaintiffs have brought their seizure claim under. But Plaintiffs clear up in a footnote in their response brief that Plaintiffs' claim for Blue's death is for an illegal seizure, a Fourth Amendment concept long-applied to the states through the Fourteenth Amendment (*See, e.g., Ker v. California*, 374 U.S. 23, 30- 34 (1963)) and made actionable by 42 U.S.C. §1983.) (Dkt. 70 at 13, ftnt 14.).

seizure of property or "effects" occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County*, 506 U.S. 56, 61, (1992) (citation omitted). It is well-established that destroying an individual's personal property meaningfully interferes with the individual's possessory interest in that property. *United States v. Jacobsen*, 466 U.S. 109, 124-25 (1984). To establish a Fourth Amendment violation, Plaintiffs must show that (1) the police officer's conduct constituted a seizure, and (2) the seizure was unreasonable. *Belcher v. Norton*, 497 F.3d 742, 747 (7th Cir. 2007). "Every circuit that has considered the issue has held that the killing of a companion dog constitutes a "seizure" within the meaning of the Fourth Amendment." *Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008).

Here, there is a genuine issue of material fact regarding the circumstances surrounding the seizure of Blue and a "reasonableness" determination by the Court on summary judgment would be improper. *See Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir.2005) ("reasonableness inquiry 'nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom'") (citation omitted).[11] A jury may consider in this analysis, for example, whether it was reasonable that despite learning of the dog in the debriefing meeting, the Defendants did not seem to consider non-lethal means to control Blue. Instead, they went into a pitch-black apartment ready to discharge their weapons. A similar lack of preparation was a significant consideration in *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*. 402 F.3d 962, 965 (9th Cir. 2005). In *San Jose*, the officers were aware of the existence of the dogs prior to the execution of the warrants. *Id.* at 968–69. The Ninth Circuit held that the officers' unnecessary shooting of the dogs during the execution of the

---

[11] Moreover, in keeping with the analysis of the false arrest claims, if there is an issue of fact regarding whether there was probable cause for the underlying warrant, then it follows that the officers could not lawfully destroy or take the dog. "In the ordinary case, the Court has viewed a seizure of personal property as per se unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized." *United States v. Place*, 462 U.S. 696, 701 (1983).

warrants was unreasonable because the officers were on notice that the premises contained dogs and they had time to devise a non-lethal plan to deal with the dogs. *Id.* at 975–76. "[T]he Fourth Amendment forbids the killing of a person's dog, or the destruction of a person's property, when that destruction is unnecessary—i.e., when less intrusive, or less destructive, alternatives exist." *Id.* at 977–78. In addition, the court held that "the killing of a person's dog constitutes an unconstitutional destruction of property absent a sufficiently compelling public interest." *Id.* at 977. Here, a jury could find the lack of preparation similarly unreasonable.

*Viilo v. Eyre* is instructive on the dispute in Galarza and Defendants' eye-witness accounts of Blue's seizure. Officers in *Viilo* testified that Bubba, plaintiff's dog, was growling and exposing his teeth and gums leading to their decision to shoot but a neighbor who witnessed the scene testified that Bubba had just come out to greet them without any signs of aggression. *Id.* at 708-709. The conflicting testimony between the neighbor and the officers was enough of a dispute to render summary judgment improper. Similarly here, the reasonableness of the seizure comes down to the credibility determinations of the Defendants versus Galarza.

*Minor Plaintiffs' Standing*

Defendants also assert that because the minor Plaintiffs do not own Blue that they do not have standing to challenge the seizure. Defendants accurately point out that a plaintiff who does not own the seized property lacks standing to bring a § 1983 claim regarding the seizure. *See Siebert, v. Severino*, 256 F.3d 648, 655 (7th Cir. 2001) (holding that husband lacked standing to sue for seizure of horses where wife was their sole owner). But the record here does not indicate that Galarza owned the dog at the exclusion of her minor children's ownership. Defendants support their argument with their Rule 56 Statement, in which Plaintiffs "admit" that "Galarza owned a Pit Bull dog called Blue." (Dkt. 71 at 4.) This is somewhat misleading. In support of

this fact, Defendants cite to a portion of the deposition in which Galarza is asked: "[a]s of April 11, 2013, how long had you had the dog Blue?" and she responded "11 years." (Galarza Dep. 66:20–23.) Defense counsel, therefore, in both the Rule 56 and the deposition used the term "you" in describing ownership to Galarza and Galarza merely adopted the statement. And, in any event, the deposition question is not conclusive of ownership because "you" could be singular or plural. Moreover, when counsel next asked Galarza: "[h]ow much did you pay for [Blue]?," she answered " [Blue] was given to *us*." (*Id.*, 70:10–11) (emphasis added). Therefore, although counsel used "you" in the question, Galarza referred to "us," referring to her family's ownership of Blue.

In addition to Plaintiffs' alleged omissions, Defendants also rely on *Siebert v. Severino* to support their standing argument, in which a husband and wife brought an action against the Department of Agriculture investigator who seized their horses without a search warrant. 256 F.3d 648 (7th Cir. 2001). The husband did not have standing to challenge the seizure of the horses because his wife owned them, but unlike here, he "admitted that he did not own the horses, and that the papers for the horses were all in [his wife's][.]" In contrast to the *Siebert* husband, MB and MG did not renounce their ownership of Blue and there are no papers stating that Galarza owned Blue. (*See* Deposition of MB, 41:4–6, 10–11) ("Q. What did you say to [the officers]? A: I was screaming why did you do that to *my* dog. … Q: And that was *your* dog, Blue? A: Yes.) (emphasis added); (*See also* Deposition of MG 6:10–12) (Q: Do you remember a time when *your* dog, Blue died? A: Yes.) (emphasis added). Moreover, during depositions of the minors Defendants' counsel referred to Blue as being owned by the minor plaintiffs by using the possessive pronoun "your" (PSOAF Number 75.). *Siebert*, therefore, does not exclude a finding

of the minors' standing and by Defense counsel's own admissions, the children owned Blue together with their mother.

Finding that the children have standing is also consistent with Illinois law. The Humane Care for Animals Act provides that, in Illinois, " '[o]wner' means any person who (a) has a right of property in an animal, (b) keeps or harbors an animal, (c) has an animal in his care, or (d) acts as custodian of an animal." 510 ILCS 70/2.06; *see also Steinberg v. Petta,* 114 Ill.2d 496, 502, 103 (1986). Illinois courts have liberally construed the Act. In *Docherty*, an Illinois appellate court held that a 10-year-old boy who agreed to take care of a neighbor's dog while the neighbor was away was an "owner" because the dog was "in his care" and was acting "as its custodian." *Docherty v. Sadler*, 293 Ill. App. 3d 892, 896 (1997); *see* 510 ILCS 5/2.16 (West 1996). The Galarza family all lived in the home and considered Blue to be their pet; if a kid from the neighborhood who watches a dog for a weekend is an "owner," certainly the minor children who lived with Blue qualify. Also, while it seems the Seventh Circuit has not dealt with this precise issue, other district courts have permitted minors to proceed in their civil rights claims for unreasonable seizure of a family dog. *See, e.g., Humane Soc. of St. Joseph County Indiana, Inc.*, 758 F.Supp.2d 737 (N.D. Ind. 2010).

### D. Qualified Immunity

Defendants also assert that Officers Rivera and Ortiz are entitled to qualified immunity because Blue posed an immediate threat to their safety. Even when a violation has been committed under the color of law, officers are entitled to qualified immunity for § 1983 claims if the law was not "clearly established" such that a reasonable officer would have known not to engage in such conduct. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004); *see also Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) (quoting *Anderson v. Creighton*, 483 U.S. 635,

640 (1987)). The validity of certain seizure fact patterns has been clearly established. *See e.g.,*

*Maryland v. Buie*, 494 U.S. 325 (1990) (incident to arrest, officers may look in immediately

adjoining spaces from which attack could be launched). Yet the question of whether the Fourth

Amendment has been violated involves a highly fact-dependent inquiry, so courts must

objectively assess whether officers' conduct violates "clearly established" law for the given fact

pattern. *See Brosseau*, 543 U.S. at 198.

Defendants Rivera and Ortiz's qualified immunity argument fails for two reasons. First,

the law is clearly established because there is no question that killing of a companion dog is a

"seizure" within the meaning of the Fourth Amendment and because even common sense

dictates that killing a household pet is only reasonable if the pet poses an immediate danger and

use of force is unavoidable. *See Viilo v. Eyre*, 547 F.3d 707, 710 (7th Cir. 2008). Second,

whether Blue posed an immediate danger is a disputed fact. Defendants assert that Blue charged

them aggressively and therefore lethal force was warranted. On the other hand, according to

Plaintiffs, Blue had never shown signs of aggression throughout his life and on the night of the

search, Blue did not charge the officers and after he was first shot, was stumbling back toward

Galarza's side when Defendants took their last shots. (*PSOAF* ¶¶ 21, 27-31.) This dispute is

suited for the jury to resolve.

Defendants cite to an unpublished Fifth Circuit opinion, *Grant v. City of Houston*. 625

Fed.Appx. 670, 672 (5th Cir. 2015). But in *Grant*, the only eye witnesses to the shooting of the

family pet were the officers and therefore there was no eyewitness to dispute whether the dog

posed an immediate threat. Here, Galarza saw the events and her testimony conflicts with the

Defendants. In *Grant* the officer who took the shot also happened to be "an experienced dog

handler, took reasonable precautions to isolate [the dog] while the house was being searched."

*Id.* Here, there is nothing indicating in the record that the Defendants sought an officer who was an "experienced dog handler" for execution of the warrant. *Grant* is further distinguishable because although the officer was an experienced dog handler, he was actually "genuinely surprised" by the dog's presence, unlike here where the Defendants knew ahead of time that there would be a likely aggressive dog. *Id.* at 676. Therefore, Defendants are not entitled to qualified immunity on the illegal seizure claim.

### E.  Illinois Post-Deprivation Remedy

Defendants next move for summary judgment on Plaintiff Galarza's claim for illegal seizure of money in violation of their constitutional rights. Defendants assert that intentional deprivations of property caused by unauthorized acts of government employees acting under color of state law do not violate due process of law under the Fourteenth Amendment so long as the state courts provide an adequate post-deprivation remedy for the loss. Defendants further argue that Plaintiffs cannot proceed on their forfeiture claim because Illinois provides such a remedy under the Illinois Drug Asset Forfeiture Procedure Act, 725 ILES 150/1 et seq (IDAFPA). *See Hudson v. Palmer*, 468 U.S. 517, 533 (1984) (if a law provides an adequate post-deprivation remedy, an intentional property deprivation caused by an unauthorized act of government employees acting under color of state law does not amount to a constitutional violation.).

Defendants' argument first fails because it rests on the proposition that their actions were unauthorized and random. For example, in *Belcher v. Norton*, the only published Seventh Circuit decision cited to by Defendants, plaintiffs brought claims alleging that they were subject to an unlawful seizure of their car in violation of the Fourth and Fourteenth Amendment. 497 F.3d 742, 750 (7th Cir. 2007). When the plaintiffs went to the tow yard to collect personal items

from their towed car, a Deputy Marshal arrived at the yard and informed plaintiffs that they were not allowed to leave the tow yard until they either paid the impoundment fees or signed the vehicle's title over to the towing company. *Id*. at 745. But under the relevant Indiana law, the plaintiffs actually had two additional weeks to claim their car before the state considered the car abandoned. The Deputy, therefore, did not comport with the statutory procedure rendering his acts random and unauthorized in seizing the car. Only after finding the Deputy's acts random and unauthorized acts did the court turn to whether the post-deprivation remedy was inadequate. The court determined that it was inadequate because under that statutory scheme, defendants were entitled to immunity and therefore the plaintiff would have no meaningful a venue to seek redress of the deprivation she claimed to have suffered. *Id.* at 753. Defendants here never assert that their actions were random and unauthorized, the threshold determination in the analysis. Perhaps conflictingly, according to Defendants' version of events, they had probable cause for their actions at every stage.

Defendants further cite to district court cases in support of their position. In *Courtney v. Chicago Police Dept.*, the district court held that the IDAFPA provided an adequate post-deprivation remedy. 2011 WL1118874, * at 1 (N.D.Ill. Mar. 24, 2011). But in *Courtney*, the court only made a conclusory statement that the defendants' actions were unauthorized without any analysis. The decision also does not provide enough context to determine whether what was adequate process in that case similarly applies to these facts. The decision says nothing more than that plaintiff's money was unlawfully seized and that she had filed under IDAFPA. It is unclear, for example, whether the IDAFPA proceeding ended in settlement, as Galarza's claim did. Or, whether similar to here, the plaintiff was not ultimately made whole by the IDAFPA proceedings. Defendants also cite to *Milton v. Wal-Mart Stores Inc*., in which the district court

dismissed plaintiffs' Fourteenth Amendment illegal seizure claim because there were no allegations that they lacked an adequate state court remedy. 2012 WL 1953197, * 1 (N.D.Ill. 2012). But there is no precedent that this is an allegation that must be specifically plead in a procedural due process claim for illegal seizure.

Defendants also cite to *Jones v. Farmer*, in which a Wisconsin state court ruled on a motion to suppress that the officers did not have probable cause to seize Jones's money. 19 Fed.Appx. 381, 383 (7th Cir. 2001). Jones was collaterally estopped from pursuing a § 1983 claim based on a violation of his constitutional rights when the government seized the money. Again, the *Jones* decision does not provide guidance on whether the IDAFPA provides adequate process as the forfeiture proceedings proceeded under Wisconsin law, not Illinois. Also in *Jones*, plaintiff was precluded under the doctrine of collateral estoppel. "The minimum threshold requirements for the application of [Illinois] collateral estoppel ... are: (1) the issue decided in the prior adjudication is identical with the one presented in the suit in question, (2) there was a final judgment on the merits in the prior adjudication, and (3) the party against whom estoppel is asserted was a party or in privity with a party to the prior adjudication. ... [But] even where the threshold elements of the doctrine are satisfied and an identical common issue is found to exist between a former and current lawsuit, collateral estoppel must not be applied to preclude parties from presenting their claims or defenses unless it is clear that no unfairness results to the party being estopped." *Reed v. Illinois*, 808 F.3d 1103, 1107 (7th Cir. 2015), *as amended* (Dec. 11, 2015) (citing *Talarico v. Dunlap*, 177 Ill.2d 185 (1997)). In this case, there simply are not enough facts to determine whether collateral estoppel applies and Defendants do not make any showing that it should under these circumstances. For example, it is unclear whether the

IDAFPA settlement was a final judgment made on the merits as required by the second element of collateral estoppel.

On the other hand, Plaintiffs do not dispute that this was an adequate post-deprivation remedy and do not dispute that the officers' acts were random and unauthorized. Galarza waived the right to hearing in settlement with the state on probable cause—the same issue necessary to analyze her illegal seizure claim. Plaintiffs only respond to Defendants' motion by arguing that the Defendants physically took the cash off of the property and that this was a "meaningful interference with an individual's possessory interests in that property." (Dkt. 70 at 18) (citing *United States v. Jacobsen*, 466 U.S. 109, 104 (1984)). This does not actually address Defendants' legal arguments about whether Galarza was given adequate post-deprivation process. Galarza, therefore, has waived the right to contest the adequacy of the process and the Motion for Summary Judgment is granted with respect to Count IV, the illegal seizure of money claim. *See C & N Corp. v. Kane*, 756 F.3d 1024, 1026 (7th Cir. 2014) (finding that a nonmovant's failure to make an argument in response to a summary judgment motion constituted a waiver of that argument).

### F. Malicious Prosecution

Defendants next move for summary judgment on Plaintiff Baskerville's malicious prosecution claim against Officer Jolliff-Blake because there was probable cause for the prosecution. In order to succeed on a malicious prosecution claim (1) the defendant commenced or continued an original criminal or civil judicial proceeding; (2) the proceeding terminated in favor of the plaintiff in a manner indicative of innocence; (3) there was an absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. *See Hurlbert v. Charles*, 238 Ill.2d 248, 255 (2010) (citing *Swick v. Liautaud*, 169 Ill.2d 504,

511-12 (1996)).  For a malicious prosecution claim, probable cause is determined based upon the facts known to the prosecution at the time of filing, "not the actual facts of the case or the guilt or innocence of the accused."  *Sang Ken Kim v. City of Chicago*, 368 Ill. App.3d 648, 655 (1st Dist. 2006).  It is plaintiff's burden to establish the non-existence of probable cause in order to survive summary judgment. *See McBride v. Grice*, 576 F. 3d 703, 706 (7th Cir. 2009); *Woods v. City of Chi.*, 234 F.3d 979, 996 (7th Cir. 2000).  One way to establish non-existence is by rebutting a grand jury's presumption of probable cause by evidence of false testimony before the grand jury. *See Freides v. Sani-Mode Manufacturing Co.*, 33 Ill. 2d 291, 296 (1965)

Plaintiffs assert that Officer Jolliff-Blake gave false testimony at the grand jury as a part of Baskerville's criminal trial in discussing the "suspected heroin" and testifying that Baskerville bought a gun on the streets for $200.  For reasons already discussed, Plaintiffs' claims relating to probable cause require credibility determinations and the malicious prosecution claim is no exception. Defendants assert it is impossible when taking the evidence in a light most favorable to Plaintiffs to find that evidence supports the accusations of Officer Jolliff-Blake's perjury.  But if a jury were to believe Plaintiffs' version of events, that Officer Jolliff-Blake came from the kitchen rather than the bedroom and that there were boxes of cake mix scattered in the kitchen, then it follows that Jolliff-Blake perjured himself in testifying that he found the bag on a bedroom dresser.  This is not entirely inconsistent with the evidence.  For example, the fact that none of the officers noticed a bag of white powder and none are present in any of the photographs taken of the room prior to Jolliff-Blake's search of the room supports Plaintiffs' version of the events.  The Motion for Summary Judgment is therefore denied with respect to Plaintiff's malicious prosecution claim.

### G. Minor Plaintiffs' State Law Claim for Intentional Infliction of Emotional Distress

In Illinois, a plaintiff claiming intentional infliction of emotional distress must demonstrate that the defendant intentionally or recklessly engaged in "extreme and outrageous conduct" that resulted in severe emotional distress. *Sornberger v. City of Knoxville, Ill*., 434 F.3d 1006, 1030 (7th Cir. 2006); *see also Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006). The tort of intentional infliction of emotional distress requires proof of four elements: (1) extreme and outrageous conduct; (2) intent or recklessness to cause emotional distress; (3) severe or extreme emotional distress suffered by the plaintiff; and (4) actual and proximate causation of the emotional distress by defendant's outrageous conduct. *Sornberger*, 434 F.3d at 1030.

As to the first element, a reasonable jury could find the actions of Defendants outrageous based on Plaintiffs' version of events. Defendants knew that there were children and a dog present in the home. There was no plan. Defendants stormed into a dark apartment at 1:14 a.m., ready to discharge their weapons. The children woke up, came out to the living room, and were forced to sit next to their dog of 11 years who had just been killed. This happened in conjunction with the Defendants threatening their mother that she could lose her children to DCFS and Defendants seizing money that Plaintiffs' children understood their mother had earned and depended on for the family's needs. At the time, MG was just 6 years old and MB was 10 years old. (MG Dep. Dkt. 63-10, 6:19–21; MB Dep., Dkt. 63-11, 13:13–15). MG testified that he saw the police officers kicking Blue's body and pointing a gun at the children. (*Id.* at 10:1–6.) MB remembers that her "brother kept looking down at his hands and he was like shaking." (*Id.* 44:16-17.) MB also remembers screaming to the Defendants, "why did you do that to my dog[?]" (*Id.* at 41:5–6.) She testified that the officers responded to her cries, "shut the f up" (*Id.* at 42:9–13.) Regardless of whether the children's accounts are factually accurate, for example

whether the officers actually kicked Blue's body or used profanity toward MB, the brutal tone of their recollection underscores the trauma that they experienced that night. There is also evidence of the children's emotional distress. Galarza testified to changes in her son's behavior and personality after the search; she testified, "[h]e's meaner now" and that he had started getting in trouble at school. (*Id.* 175:1–3, 11–14.) Baskerville also testified to his son's change in behavior: "He said he hate [sic] the police. He just got it -- he talk about killing people now. He just angry." (Baskerville Dep., 297:4–6.) With respect to MB, Baskerville testified that after the incident his daughter's grades dropped from A to Ds and that she struggles with mourning Blue: "[]she talk about is her friend gone. she sleep [sic] with its ashes every night." (*Id.* at 298:3–4; 299:13–15.) After the search, Galarza and her two children saw a therapist together. (Galarza Dep., 172:12–17.) MB continues to be treated by a therapist and MG saw his school counselor. (*Id.* 172:12–173:9.) In *Sornberger*, minor plaintiffs brought an IIED claim and the court found that their drop in grades and attitude problems after their parents' incarceration was not the type of severe distress actionable under Illinois law. 434 F.3d at 1030. However, Illinois courts "have been more inclined to characterize the emotional distress as severe" when the distress has manifested itself "either through physical symptoms or has necessitated medical treatment." *Honaker v. Smith*, 256 F.3d 477, 496 (7th Cir. 2001). Although some of Plaintiffs' evidence resembles that of the minors in *Sornberger*, e.g., changes in grades and attitudes, here those changes are accompanied by the need for medical treatment from mental health practitioners. That MB and MG's injuries necessitated treatment demonstrates that there is a disputed issue of fact as to whether Defendants' conduct caused emotional distress in the children. *Honaker*, 256 F.3d at 496.

### H.  Indemnification

Finally, Defendants move for summary judgment on Plaintiffs' indemnification claim. Plaintiffs seek to have the City pay, pursuant to 745 ILES 10/9-102, any tort judgement for compensatory damages that is entered against the Defendant Officers. (Am. Compl., Dkt. 57, ¶¶ 56-57.) The indemnity applies only if the Defendants are found liable in their individual capacity. Defendants assert that because Counts I through V fail that the indemnification claim must fail. Based on the above rulings, the indemnification claim stands on Counts I-III and V. Plaintiffs cannot recover for indemnity on Count IV on which Defendants' Motion for Summary Judgment is granted.

## CONCLUSION

For those reasons, Defendants' Motion for Summary Judgment [60] is denied with respect to all claims except Count IV, for illegal seizure of money, which is dismissed. Plaintiffs' Motion to Strike Defendants' Responses to Plaintiffs' Additional Statement of Facts [84] is granted.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: September 18, 2017